UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TED STEVENS,

        Plaintiff,

    v.                          Case No. 20-C-1735

KEVIN CARR, et al.,

        Defendants.

---

## SCREENING ORDER

---

Plaintiff Ted Stevens, who is currently serving a state prison sentence at Oshkosh Correctional Institution (OCI) and representing himself, filed a complaint under 42 U.S.C. § 1983, alleging that Defendants violated his Eighth Amendment rights. This matter comes before the Court on Stevens' motion for leave to proceed without prepaying the full filing fee and to screen the complaint.

### MOTION TO PROCEED WITHOUT PREPAYMENT OF THE FILING FEE

Stevens has requested leave to proceed without prepayment of the full filing fee (*in forma pauperis*). A prisoner plaintiff proceeding *in forma pauperis* is required to pay the full amount of the $350.00 filing fee over time. *See* 28 U.S.C. § 1915(b)(1). Stevens has filed a certified copy of his prison trust account statement for the six-month period immediately preceding the filing of his complaint, as required under 28 U.S.C. § 1915(a)(2), and has been assessed and paid an initial partial filing fee of $30.08. Stevens' motion for leave to proceed without prepaying the filing fee will be granted.

## SCREENING OF THE COMPLAINT

The court has a duty to review any complaint in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity, and dismiss any complaint or portion thereof if the prisoner has raised any claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b). In screening a complaint, the Court must determine whether the complaint complies with the Federal Rules of Civil Procedure and states at least plausible claims for which relief may be granted. To state a cognizable claim under the federal notice pleading system, Stevens is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). It must be at least sufficient to provide notice to each defendant of what he or she is accused of doing, as well as when and where the alleged actions or inactions occurred, and the nature and extent of any damage or injury the actions or inactions caused.

"The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556. "[T]he complaint's allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 (internal quotations omitted).

**ALLEGATIONS OF THE COMPLAINT**

Stevens' complaint centers around conditions of confinement resulting from COVID-19 outbreaks at OCI. He notes that the first COVID-19 outbreak in the Wisconsin prison system was documented in late February 2020. In response, Warden Cathy Jess, Deputy Warden Zanon, and Security Director Toney closed the visiting room, stopped all schooling and program activities, restricted family visits, and essentially put the prison on a modified lockdown in March 2020. Dkt. No. 1 at 4–5.

In mid-March, staff provided four surgical masks, and then a week later one cloth mask to each prisoner. Despite the shutdown of the school programs, institution officials continued to allow teachers and program officials to enter the institution. There was a small outbreak at the institution in March, leading to a fourteen-day lockdown. During April and May, staff did not provide additional disposable masks to inmates and would not allow family members to purchase additional masks for them. In June, all inmates and staff members were tested, with Jess announcing that only one inmate originally tested positive, but upon retest, he tested negative. Stevens alleges that after testing, Jess restarted schooling, which took place in overcrowded and poorly ventilated rooms. To address the outdated ventilation, wall and ceiling fans ran on high all day. Stevens alleges the prisoners were exposed to hundreds of outside workers. Stevens was scared to attend school, because of the potential risk of exposure, and wrote request slips to Jess, Zanon, and Toney asking that inmates not be forced to attend. But he was told by the "white shirts" that "by the 309.55.04 policy you got to go to school because it is an [sic] mandatory policy." *Id*. at 5.

In early September 2020, officers directed all inmates to return to their units; the institution was put on another fourteen-day lockdown. During this period, inmates were allegedly not allowed to use phones, washing machines, or obtain cleaning supplies. In late September, the

3

National Guard conducted another mass testing. A few days later, Jess posted a memo telling inmates that their privacy would be respected in notifying individuals of positive results. That same day, Ms. Harden arrived at the officers' station with a list of inmates who had tested positive and shared this information with Officers O'Connell, Schlieve, Johannes, Wolf, Passirella, and John Doe. Harden then moved through the unit, notifying inmates individually that they had tested positive and needed to pack up. After those inmates were removed, prison leadership allegedly refused to provide the cellmates of COVID-19–positive inmates with cleaning supplies. They also repeatedly restarted fourteen-day lockdowns as inmates continued to get sick. *Id.* at 6.

On October 14, 2020, the institution conducted another mass testing event. Prisoners who had been removed after the previous round were allegedly returned, even if they were still sick. Harden again shared the names of the newly infected inmates with officers and proceeded to notify COVID-19–positive inmates of their status by calling out their names. Stevens, who had tested positive, protested the violation of his HIPAA privacy rights and accused staff of retaliating against inmates who complained about conditions. He was told to "pack up or go to segregation," so he packed and was taken to the R-Building, where infected inmates were being held. Stevens alleges that he and other inmates were placed in cold, dirty cells and were refused cleaning supplies. *Id.* at 7. When Stevens complained about the inadequate food and dirty conditions to Sergeant Schroeder, she allegedly told him that they could only give prisoners what the kitchen gave them, and Supervisor Vande Voort would not allow them to clean or provide cleaning supplies to inmates. He put in a request slip to Vande Voort about the conditions but received no response. *Id.*

Stevens alleges that, although he had COVID-19 prior to relocating to R-Building, it wasn't until after he arrived there that he began having symptoms, including fever and diarrhea. Because the toilets were on a one-hour timer, and both he and his cellmate were experiencing diarrhea, the

4

cell smelled of feces. Stevens alleges that so many of the inmates were hitting the buzzers to complain that Schroeder would yell over the loudspeaker "stop hitting y'all buzzers." *Id.* Stevens also alleges that Health Services Unit (HSU) staff only checked on them "about once a week," and in order to get their attention "you had to catch them as they came into are [sic] side on an ambulances call." *Id*. at 7–8. He could not identify health services staff because everyone was masked. On several occasions, he buzzed and told Schroeder that it was hard for him to breathe and she informed him that the HSU told her "to stop calling them and to tell inmates just to breath [sic] slowly in and out and if it doesn't work to go to the window and open it up and keep trying." *Id.* at 8. She walked away as he yelled at her. Stevens alleges that he was not given any medication for his headache, coughing, or difficulty breathing, and that Vande Voort ignored him when he tried to complain about the conditions. *Id*.

### THE COURT'S ANALYSIS

"To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that this deprivation occurred at the hands of a person or persons acting under the color of state law." *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan–Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). Stevens asserts that he is suing Defendants in their official capacities, Dkt. No. 1 at 4; however, he seeks only damages, not injunctive relief, suggesting that he does not understand the implication of his assertion. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991) (explaining that state officials are "persons" under § 1983 only if sued for injunctive relief; state officials may not be sued for damages in their official capacity). Given that Stevens seeks only damages, the Court understands that he wishes to sue Defendants in their individual capacities.

5

**A. Kevin Carr**

In order to be liable under § 1983, an individual has to "have been personally responsible for the deprivation of the right at the root of a § 1983 claim." *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869 (7th Cir. 2011) (internal quotations omitted). "[A] defendant need not 'participate[] directly in the deprivation' for liability to follow under § 1983." *Id*. at 870 (quoting *Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001)). However, they must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id*. (internal quotations omitted).

Stevens fails to state a claim against Carr, the Secretary for the Wisconsin DOC. Stevens alleges no facts from which the Court can reasonably infer that Carr was personally responsible for directing the specified actions at the prison, nor do Stevens' allegations suggest that Carr facilitated, approved, or condoned the alleged actions. Carr will be dismissed as a defendant.

**B. V. Harden, Sgt. O'Connell, Sgt. Schlieve, CO Johannes, CO Wolf, CO Passirella, and John Doe Officers**

Stevens also fails to state a claim against these individuals. Stevens asserts that, under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Publ. L. No. 104–191, 110 Stat. 1936, they disclosed his protected health information without his consent. HIPAA provides that the Secretary of Health and Human Services (HHS) can seek both civil and criminal penalties for improper disclosures of protected health information. *See* 42 U.S.C. §§ 1320d-5(a)(1), 1320d-6. However, there is no express language in the statute conferring a private right of action, and courts have routinely held that HIPAA does not create a private cause of action. *See, e.g.*, *Meadows v. United Servs.*, 963 F.3d 240, 244 (2d Cir. 2020) ("[T]he statute clearly reflects that Congress did not intend for HIPAA to create a private remedy."); *Faber v. Ciox Health, LLC*, 944 F.3d 593, 596 (6th Cir. 2019) ("HIPAA doesn't authorize a private cause of action."); *Sneed v.*

*Pan Am Hosp.*, 370 F. App'x 47, 50 (11th Cir. 2010) ("We decline to hold that HIPAA creates a private cause of action, *see Acara v. Banks*, 470 F.3d 569, 571–72 (5th Cir. 2006), or rights that are enforceable through § 1983.").

Stevens alleges only that the officers received his private medical information, not that they disclosed it. And, although he alleges that Harden disclosed his information, he has no private right of action against her for doing so. Consequently, he fails to state a claim against Harden, O'Connell, Schlieve, Johannes, Wolf, Passirella, and John Doe. The Court will dismiss them as defendants.

### C. Cathy Jess, J. Zanon, and E. Toney

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). In order to demonstrate a violation of the Eighth Amendment, a prisoner must make two showings. "First, the deprivation alleged must be, objectively, sufficiently serious. *Id*. at 824 (quotations omitted). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. The second requirement is that the prison official was deliberately indifferent "to inmate health or safety," *id*., meaning that he was both aware of and disregarded "an excessive risk to inmate health or safety," *id*. at 837.

Stevens alleges that Jess, Zanon, and Toney were deliberately indifferent to his risk of contracting COVID-19, a virus that can, in rare cases, lead to pneumonia, respiratory failure, or death. The transmissibility of the COVID-19 virus in conjunction with Stevens' living conditions, which he alleges were overcrowded and poorly ventilated, are sufficient to satisfy the objective

7

prong, *i.e.*, that Stevens was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 832; *see Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020).

Thus, the pertinent question in determining whether Stevens states a claim is whether Jess, Zanon, and Toney's actions demonstrated deliberate indifference to that risk of harm. The key inquiry is not whether Defendants perfectly responded or whether their efforts ultimately averted the risk; instead, the key inquiry is whether they "responded reasonably to the risk." *See Wilson*, 961 F.3d at 842–43 (quoting *Farmer*, 511 U.S. at 844).

Stevens details the many measures Defendants implemented in order to protect the inmates from the risks of contracting COVID-19. Beginning in March, Jess, Zanon, and Toney closed the visiting rooms, stopped all schooling and program activities, and restricted family visits in an effort to limit the number of people coming into the prison. Also in March, inmates were provided with four disposable masks and then one cloth mask. After a small outbreak occurred, the prison was placed on a fourteen-day lockdown to limit movement within the prison. In June, everyone in the prison was tested; all results were negative. School was then restarted, with fans running on high to circulate the air. Those who entered the prison were required to have their temperature checked and answer screening questions. In September, another fourteen-day lockdown was implemented to once again limit movement within the prison and minimize the risk of the inmates infecting one another. Also in September, everyone in the prison was again tested. Those who tested positive were moved to a different part of the prison for at least fourteen days in an effort to prevent them from infecting others. As inmates continued to test positive, prison officials restarted fourteen-day lockdowns to limit movement.

Based on the many measures implemented by Defendants, the Court cannot reasonably infer that Defendants failed to respond reasonably to the risk Stevens faced. Other courts that considered similar actions by prison officials have reached the same conclusion. *Wilson*, 961 F.3d

8

at 840–41; *Swain v. Junior*, 958 F.3d 1081, 1085–91 (11th Cir. 2020); *Valentine v. Collier*, 956 F.3d 797, 802–03 (5th Cir. 2020); *Wilcox v. Washington*, No. 20-cv-221, 2020 WL 6737431 (W.D. Mich. Nov. 17, 2020).

Stevens argues that Defendants should have done more, such as provide him with additional masks and cleaning supplies so he could sanitize his personal space, but it is unclear how these measures would have provided Stevens with additional protection. Stevens explains that movement in the prison was highly restricted and he was largely confined to his cell with his cellmate. Like individuals living in the same house, wearing a mask in his cell—where he was constantly exposed to his cellmate but no one else—was unnecessary. For the limited times he was allowed to leave his cell (to go to school or to be tested), Stevens had use of a reusable cloth mask. Although there were periods when Stevens was unable to use the washing machines to wash his mask, these were the same periods he was unable to leave his cell at all, making cleaning his mask unnecessary. To the extent Stevens wanted to use his mask in his cell, he could have washed the mask by hand in his sink and hung it out to dry overnight. Similarly, although Stevens was unable to sanitize the space that he shared with his cellmate, it is unclear why doing so was necessary given that it does not appear anyone but him and his cellmate were allowed into his cell. Stevens also alleges that he was not able to sanitize the cell he moved to after he tested positive, but doing so would have had no impact given that he was already positive.

The Court is not discounting Stevens' concerns about contracting COVID-19. His concerns are valid and significant. However, nothing in Stevens' complaint suggests that Jess, Zanon, and Toney disregarded the risk he faced. Accordingly, he fails to state a claim against them.

### D. Sgt. Schroeder, Vande Voort, and HSU Does

Stevens also asserts claims against Schroeder, Vande Voort, and unidentified individuals working in health services for placing him in inhumane conditions and endangering his life after he tested positive and moved to a new cell. He asserts that his cell was cold, smelly, and dirty, and he was not given cleaning supplies when he requested them. He also alleges that he was not given enough food. Despite the worsening of his symptoms, including fever, coughing, pain, and diarrhea, Schroeder allegedly told him that she was not authorized to give him more food, and that health services had told her to stop calling them. Stevens alleges that health services only checked on sick inmates about once a week and provided him no treatment for his symptoms, and, per Schroeder, was also allegedly instructing inmates to breathe slowly and go to an open window to alleviate coughing.

With regard to the conditions of his cell while he was in isolation, the conditions Stevens alleges, even when taken together, are not so extreme that the Court can infer he was denied "the minimal civilized measure of life's necessities." *See Farmer*, 511 U.S. at 834. Stevens alleges that his cell smelled of body odor from previous inmates and of feces because he and his cellmate had diarrhea and could flush the toilet only once per hour. Although the smell was no doubt offensive, Stevens does not allege that he suffered any harm or even a risk of harm from the offensive odors. *See Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). Stevens' allegations that he was not provided with cleaning supplies to sanitize his new cell also fail to state a claim. Stevens and his cellmate were both COVID-19–positive when they moved into the cell, so they suffered no risk of additional harm from being unable to sanitize the new cell.

Stevens also alleges that there was no heat in his cell so it became cold. During the last few weeks of October 2020, outside temperatures in Oshkosh, Wisconsin ranged mostly in the thirties and forties at night and in the forties and fifties during the day. *See Oshkosh, Wisconsin*,

ACCUWEATHER.COM, *available at* https://www.accuweather.com/en/us/oshkosh/54901/october-weather/331524?year=2020 (last visited Jan. 4, 2021). While it was undoubtedly warmer inside the institution than outside, the outside temperature did dip below freezing on a few nights. Still, Stevens explains that he was allowed to bring all of his property to his new cell, including his clothing and bedding, suggesting he had alternate means to keep warm. Nothing in Stevens' complaint suggests these means were inadequate to combat the cold. *See Dixon v. Godinez*, 114 F.3d 640, 642–43 (7th Cir. 1997) (explaining that exposure to extreme cold temperatures without alternative means of keeping warm could state a claim).

Finally, Stevens' allegations that he did not get enough food while in isolation also fails to state a claim. Although Stevens would have liked more food, his allegations that he received a slice of meat, bread, and a handful of chips at meal time, along with two peanut butter and two jelly squeeze packs with four pieces of bread at breakfast do not suggest the food he received was nutritionally inadequate or that he suffered harm as a result of the changes to his meal plan. *See Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015).

Stevens also fails to state a claim based on his allegations that health services staff was deliberately indifferent to the symptoms he developed after testing positive for COVID-19. Stevens explains that he developed the common symptoms of fever, headaches, difficulty breathing, and diarrhea. These symptoms, which are akin to a bad cold or a mild flu, are not sufficiently serious to satisfy the objective prong. *See Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) ("A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution.") Millions of people in the United States have suffered from these same symptoms. Most did not receive medical treatment; instead, like Stevens, they rested at home and

allowed their bodies to fight the infection. And, while enduring these symptoms was no doubt unpleasant, part of the issue with this pandemic is that there are few treatments to combat COVID-19 and the ones that do exist are largely unavailable to the general population. Thus, even though Stevens alleges health services checked on him only once per week, nothing in his complaint suggests that more frequent checks would have altered the advice or treatment he received. Fortunately, it appears that Stevens' case was relatively mild and resolved—as many other millions of cases have—on its own without medical intervention.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Stevens' motion for leave to proceed *in forma pauperis* (Dkt. No. 7) is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED** pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1) **for failure to state a claim**.

**IT IS FURTHER ORDERED** that the Clerk of Court document that this inmate has incurred a "strike" under 28 U.S.C. §1915(g).

**IT IS FURTHER ORDERED** that the agency having custody of the prisoner shall collect from his institution trust account the $319.92 balance of the filing fee by collecting monthly payments from Plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this action. If Plaintiff is transferred to another institution, the transferring institution shall forward a copy of this order along with Plaintiff's remaining balance to the receiving institution.

**IT IS FURTHER ORDERED** that copies of this order be sent to the officer in charge of the agency where the inmate is confined.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Green Bay, Wisconsin this 5th day of January, 2021.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. § 1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.